UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CIANBRO CORPORATION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 2:08-CV-128-H |
| | ) | |
| GEORGE H DEAN, INC., d/b/a | ) | |
| DEAN STEEL, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON PLAINTIFFS' MOTIONS
FOR SUMMARY JUDGMENT AND ORDER ON
MOTION TO FILE SUR-REPLY**

Plaintiff Cianbro Corporation and Intervenor Plaintiffs Hornbeck Offshore Transportation and Hornbeck Offshore Services have filed motions for summary judgment (Docs. 36 & 44), requesting affirmative relief on their petitions for declaratory relief under 46 U.S.C. § 31343, to the effect that vessels owned by the Hornbeck entities are not subject to liens and are not subject to notices of claims of lien asserted by Defendant George H Dean. These motions have been referred for report and recommendation. I now recommend that the Court grant the plaintiffs' motions.

**PROCEDURAL BACKGROUND**

This action was commenced by Plaintiff Cianbro Corporation, a general contractor that performed work on two vessels owned by the Hornbeck intervenor plaintiffs. Cianbro warranted to return the vessels to Hornbeck free of liens. George H Dean ("Dean Steel"), a supplier of steel products, filed a notice of claim of lien against each vessel, which frustrated Cianbro's desire to

return the vessels to their owners free of any lien or notice of claim of lien. Based on its interest under its warranty Cianbro commenced this action to obtain declaratory relief that would extinguish any lien or notice of claim of lien asserted by Dean Steel. In a prior memorandum of decision on Cianbro's motion for approval of a bond to prevent the arrest of the vessels, Dean Steel called into question Cianbro's standing to pursue a declaratory action concerning the notices of liens insofar as Cianbro is not the owner of the vessels and its continued custody of the vessels was also in question. Because the motion pending at that time sought only approval of a bond, I left the standing question for another day based on a conclusion that Cianbro could petition the Court for approval of a bond to protect the vessels even if there were doubt as to Cianbro's standing to pursue to judgment its complaint for declaratory relief. Since that time, to avoid any potential shoals related to the standing question, the Hornbeck owners filed a motion to intervene in the action. (Doc. 26.) The Court granted that motion in the absence of any objection by Dean Steel. (Doc. 28.) The intervenors' complaint was duly filed and answered. Now that they have intervened Dean Steel has made no further argument that standing presents an obstacle to judgment, either on Cianbro's complaint or the Hornbeck complaint. Nor has there been any challenge as to venue despite the movement of the vessels out of this District since the commencement of this action. I can discern no jurisdictional impediment preventing the Court from resolving this dispute.

## FACTS

The following facts are drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements.[1]

---

[1] Cianbro and the Hornbeck intervenor plaintiffs filed separate statements of material fact, but those statements are, in all *material* respects, identical to one another. I have cited to Cianbro's statement, to Dean Steel's opposition to Cianbro's statement, and to Dean Steel's additional statement, exclusively, to avoid cluttering this

See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

Hornbeck Offshore Services, LLC, is the owner of the *M/V Benno C. Schmidt*. Hornbeck Offshore Transportation, LLC, is the owner of the *M/V Energy Service 9001*. (Cianbro's Statement of Material Facts ¶ 3, Doc.37.) The two Hornbeck entities will be referred to, collectively, as "Hornbeck." Cianbro Corporation is a construction company situated in Maine. (Id. ¶ 1.)

In 2006, Hornbeck Offshore Services and Cianbro entered into a Vessel Conversion Contract (VCC) for the conversion of "up to two sulphur tankers into multi-purpose supply vessels."[2] (Id. ¶ 4; Dean Appendix Ex. A, Vessel Conversion Contract (VCC), Doc. 60 at 3, 6, 20.[3]) The work took place at Cianbro's facilities in Portland Harbor. (Dean's Additional Statement ¶ 1, Doc. 63.) Cianbro warranted to Hornbeck that it would complete the project free and clear of any liens arising from the work. (Cianbro's Statement ¶ 16.) Hornbeck and Cianbro understood that Cianbro would not perform all of the work or supply all of the materials needed to complete the VCC project. They understood that third-party subcontractors and supplier

---

Recommended Decision with multiple citations to the Hornbeck statement. Based on my review of the Local Rule 56 filings made by Hornbeck, I do not believe I have overlooked any material fact offered by them but not by either Cianbro or Dean Steel.

[2] Hornbeck Offshore Transportation, which owns the *M/V Energy Service 9001*, was not a party to the Vessel Conversion Contract. Nevertheless, both vessels were converted even though only Hornbeck Offshore Services entered into the contract with Cianbro. I proceed from the basis that Hornbeck Offshore Transportation authorized Hornbeck Offshore Services to contract with Cianbro for conversion work on the *M/V Energy Service 9001*.

[3] Page citations refer to the page number of the .pdf document, rather than to the page numbers stated on the original document.

would perform portions of the work and/or provide some of the necessary materials. (Dean's Additional Statement ¶¶ 11-13.)

Under Article 6 of the VCC, which pertains to "Subcontracts," Hornbeck retained the right to determine which bids from "prospective Subcontractors and from suppliers of Materials or equipment fabricated especially for the Work" would be accepted. (Dean's First[4] Opposing Statement ¶ 5, Doc. 55; Dean Appendix. Ex. A, VCC § 6.2, Doc. 60 at 11.) In furtherance of the VCC project, Cianbro issues a purchase order to an entity called HUB Technologies, Inc., to furnish and deliver to Cianbro certain fabricated steel structural components to be incorporated into the vessels. (Cianbro's Statement ¶ 6; Dean's First Opposing Statement ¶ 5, Doc. 55; Dean Appendix Ex. B, Purchase Order, Doc. 60 at 22-27.) These structural components were necessary parts of the vessels that enabled them to perform their particular function. (Dean's Additional Statement ¶ 25.) Prior to awarding the bid to HUB, Cianbro identified HUB to Hornbeck and delivered HUB's bid proposal to Hornbeck for review. (Id. ¶ 27.) The purchase order materials that Cianbro sent to HUB identified Hornbeck as the customer and reflected that the structural components would be incorporated into vessels. (Id. ¶ 30; Dean Appendix Ex. B.[5]) Terms and conditions attached to the purchase order required HUB to guarantee its product to both Cianbro and Hornbeck. (Dean Additional Statement ¶ 34; Dean Appendix Ex. B, Attachment 1 ¶ 5 (Doc. 60 at 25).) They also provided that Cianbro could withhold payment to HUB in the event that HUB failed to pay any of its project-related debts and liens were asserted against the project. (Dean Additional Statement ¶ 35; Dean Appendix Ex. B, Attachment 1 ¶ 8.)

---

[4] Dean Steel's second opposing statement (Doc. 56) relates to the virtually identical statement offered by Hornbeck.
[5] Dean Steel erroneously cites exhibit C of its appendix.

This term authorized Cianbro to direct payment toward these debts or creditors rather than toward HUB.  (Id.)

HUB obtained steel from both Cianbro and from Defendant Dean Steel in order to build the structural components ordered by Cianbro.  (Cianbro's Statement ¶ 7;  Dean's Additional Statement ¶ 37.)  HUB built the structural components ordered by Cianbro using the steel supplied to HUB by Cianbro and Dean Steel.  During the course of the project, Cianbro shipped 230,000 pounds of steel in its possession to Dean Steel's facilities in Rhode Island so that Dean Steel could perform some initial cutting work on the steel.  (Dean's Additional Statement ¶ 39.)  Between November 2006 and October 2007, HUB ordered from Dean Steel and Dean Steel supplied to HUB additional quantities of raw structural steel that HUB used to construct structural components for the vessels.[6]  (Id. ¶ 43.)  HUB made Dean Steel aware that the steel was being used in the VCC project.  (Id. ¶ 44.)  In order to perform the initial cutting work that it did on both the Cianbro-supplied steel and its own steel, Dean Steel was provided with copies of the plans, drawings and specifications for the VCC project.  (Id. ¶ 45.)  However, Dean Steel admits that it received no instructions from Cianbro regarding how Dean Steel was to perform its work.  (Cianbro's Statement ¶ 27.)

Cianbro paid HUB in full for its performance under the purchase order.  (Id. ¶ 8;  Dean's First Opposing Statement ¶ 8.)  HUB filed a petition in bankruptcy in the United States Bankruptcy Court for the Eastern District of Massachusetts on November 6, 2007.  (Cianbro's Statement ¶ 9.)  Dean Steel is owed $249,910.52 for steel supplied to HUB and used by HUB to manufacture the structural components ordered by Cianbro.  (Id. ¶ 10.)

---

[6] The record does not contain any copies of purchase orders between HUB and Dean Steel.  At least, the summary judgment statements do not call the Court's attention to any.

Dean Steel filed Notices of Claim of Maritime Lien against the Vessels with the United States Coast Guard National Vessel Documentation Center, asserting that the liens arise from the provision of necessaries to the Vessels. (Id. ¶¶ 10-12.) The notices indicate that the necessaries were provided between November 15, 2006, and September 18, 2007. (Id. ¶¶ 11-12.)

Dean Steel had no communications prior to September 18, 2007, with any employee of the Hornbeck entities regarding the VCC project. (Id. ¶ 13.) Cianbro offers a statement that no Cianbro management or purchasing officers had any communications with Dean Steel prior to September 18, 2007, regarding the Vessels, Hornbeck, or the VCC project. (Id. ¶ 14.) Dean Steel denies this statement. Its record citations indicate that there were communications related to shipments of steel from Cianbro to Dean Steel, though it does not suggest that it can produce any that involve Cianbro management or purchasing officers. (Dean's First Opposing Statement ¶ 14.) The specifics of these communications are that, in December 2006, HUB engaged trucking services and instructed Cianbro to release roughly 230,000 pounds of plate steel for delivery to Dean Steel. (Cianbro's Statement ¶ 22.) A Cianbro entity called Cianbro Fabrication and Coatings, Inc., produced material transfer receipts to document the transfer of the plate steel. (Id. ¶ 23.)

During the course of Dean Steel's performance of its several purchase orders from HUB regarding the Cianbro Project, Dean Steel delivered its steel product to HUB, not to Cianbro. HUB, in turn, delivered the structural components to Cianbro. (Id. ¶¶ 24, 26.) Cianbro never interfered with Dean Steel's delivery of steel to HUB, nor did Cianbro ever issue any stop orders to HUB for steel that HUB ordered from Dean Steel. (Dean's Additional Statement ¶ 48.)

Cianbro states that at all times between November 15, 2006, and September 18, 2007, it was a general contractor working for Hornbeck under the VCC. (Cianbro's Statement ¶ 15.)

6

Cianbro also states that HUB was its subcontractor and that Dean Steel was a subcontractor to HUB. (Id. ¶ 20.) Dean Steel does not object to the characterization of Cianbro as a general contractor, but it tries to avoid the subcontractor label for itself, asserting instead that both it and HUB were "suppliers" rather than "subcontractors." (Dean's First Opposing Statement ¶ 20.)

Dean Steel is unable to point to any contractual relationship or purchase order running between Hornbeck or Cianbro and itself. Nor can Dean Steel point to any contract between Hornbeck and HUB. Instead, Dean Steel points to provisions of the VCC entered into by Hornbeck and Cianbro. Dean Steel asserts that the language of the VCC anticipates that liens might arise against the Vessels on account of acts by the Contractor (Cianbro), separate and apart from any liens that might be created by the Owner (Hornbeck), or the Owner's own subcontractors, vendors, or employees. (Dean's First Opposing Statement ¶ 16; Dean's Appx. Ex. B, VCC ¶ 8.1.3, Doc. 60 at 13.) In addition, Dean Steel offers an affidavit from the President of HUB, Mr. Harley Waite, to the effect that Waite explained to Cianbro that HUB did not supply, warehouse, or distribute structural steel and that it would need to acquire the steel from suppliers. (Dean's First Opposing Statement ¶ 20; Dean's Additional Statement ¶ 28; Waite Aff. ¶ 8.) Dean Steel also offers a statement that it did not require payment "in advance" from HUB; that, instead, it relied on the credit of HUB and the vessels. (Dean's Additional Statement ¶ 46.) There is some question how this statement should be interpreted. After all, it reflects that payment was expected from HUB and no other party. There is also no suggestion that Dean Steel would have had any basis to rely on the credit of Cianbro. Dean Steel also advances the following statements, all admitted by Cianbro:

> 50. Cianbro never informed HUB that it was not authorized to incur liens on the Vessels or to extend credit on the Vessels when it ordered Materials for the Conversion Project.

7

> 51. Cianbro did not require that HUB, when purchasing Materials from Suppliers for the Conversion Project, inform its Suppliers that they could not place liens on the Vessels.
>
> 52. HUB never informed Dean Steel that it was not authorized to incur liens on the Vessels or to extend credit on the Vessels.
>
> 53. Cianbro has no evidence that Dean Steel had any knowledge that HUB was not authorized to incur liens on the Vessels.

(Dean's Additional Statement ¶¶ 50-53.) Dean Steel also professes that it believed that HUB was an agent of both Hornbeck and Cianbro. (Id. ¶ 54; Leroux Aff. ¶ 14, Doc. 59.)

Cianbro offers statements to the effect that Hornbeck never granted any authority to Cianbro to "create any contractual relationship between Hornbeck and any subcontractor of Cianbro" and that Cianbro never entered into any such contracts. (Cianbro's Statement ¶¶ 17-18.) Dean Steel does not offer any contrary evidence. Instead, it maintains that the law respecting maritime liens makes these statements immaterial "because a contractual relationship between the Vessel's owner and a provider of Necessaries is not required in order for the provider . . . to maintain a maritime lien against the Vessels. (Dean's First Opposing Statement ¶¶ 17-18.)

During the course of the VCC project, Dean Steel never attempted to contact Hornbeck or Cianbro to determine whether HUB was an authorized agent of Hornbeck. (Cianbro's Statement ¶ 32.) At no time did Dean Steel ever attend the vessels. (Id. ¶ 33.)

Part of the Cianbro project included removal and replacement of the bow sections of the Vessels. As a result of the filing of the Notices of Claim of Maritime Lien by Dean Steel, Hornbeck required Cianbro to issue letters of indemnification to Hornbeck and to the purchaser of the old bow sections against any claim or expense arising out of the Notices. (Id. ¶ 19.)

8

## MOTION TO FILE SUR-REPLY

Dean Steel has requested an opportunity to file a sur-reply to challenge some of the denials and qualifications offered by Cianbro and Hornbeck in their Local Rule 56 reply statements. (Doc. 69.) The motion is **DENIED**. Parenthetically, I observe that most, if not all, of Dean Steel's concerns over the plaintiffs' objections and denials have been resolved in its favor based on a review of the core Local Rule 56 statements, without any consideration of the proposed sur-reply arguments and citations. For instance, I have not stricken Mr. Leroux's challenged attestations about what he subjectively believed about HUB's agency status. Nor have I entertained Hornbeck's challenge about whether Cianbro can determine if the steel provided to HUB by Dean Steel was ever incorporated into the vessels or to what extent it went into either vessel. I note that to the extent Hornbeck's reply statement contained the response that certain record citations were not of evidentiary quality and "should be stricken," Local Rule 56 (e) already gives Dean Steel the opportunity to respond without further leave of court. This proposed sur-reply goes beyond what is envisioned in the Local Rule and is not allowed.

## DISCUSSION

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing the record for

a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

In its complaint (Doc. 1) Cianbro requests declaratory relief in two counts. First, Cianbro asks the Court to declare that the *Benno C. Schmidt* and the *Energy Service 9001* are not subject to any maritime lien or notice of claim of maritime lien. Second, Cianbro requests a second declaration that the Old Bow Sections removed from the vessels are not subject to any maritime lien or notice of claim of maritime lien in favor of Dean Steel. The complaint filed by the Hornbeck plaintiffs (Doc. 29) is to the same effect. Pursuant to the Federal Maritime Lien Act, 46 U.S.C. §§ 31301-31343:

> The district courts of the United States shall have jurisdiction over a civil action in Admiralty to declare that a vessel is not subject to a lien . . . or that the vessel is not subject to the notice of claim of lien, or both, regardless of the amount in controversy or the citizenship of the parties. Venue in such an action shall be in the district where the vessel is found or where the claimant resides or where the notice of claim of lien is recorded.

Id. § 31343(c)(2).

Dean Steel maintains that it has a maritime lien against each of the Hornbeck vessels, by operation of sections 31341 and 31342 of the Act. In the latter section, the Act provides that "a person providing necessaries to a [non-public] vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel." Id. § 31342. In the former section, the Act provides, as discussed below, that there are certain persons who are presumed to

have authority to procure necessaries for a vessel. Id. § 31341. In this case, the parties agree that the steel Dean Steel supplied to HUB would constitute "necessaries" for purposes of the Act. However, Cianbro and Hornbeck challenge the notions that Dean Steel supplied its steel to the vessels on the order of the owner or a person authorized by the owner to bind the vessels. (Pl.'s Mot. for Summary J. at 6-7, Doc. 36.)

The Act provides that certain persons are presumed to have the authority to procure necessaries for a vessel. Those persons are the owner, the master, a person entrusted with the management of the vessel at the port of supply, or an officer or agent appointed by, among others, the owner. Id. § 31341(a). Dean Steel argues that Hornbeck and Cianbro are both persons presumed to have authority to procure necessaries for the vessels. (Def.'s Opposition Mem. at 7-13.) I agree that, for purposes of section 31341, Hornbeck Offshore Services is an person presumed to have such authority because it owned one of the vessels and presumptively served as an officer or agent appointed by Hornbeck Offshore Transportation with respect to the procurement of necessaries for the other vessel, pursuant to 46 U.S.C. § 31341(a)(1) & (a)(4)(A). Similarly, I agree that for purposes of summary judgment, there is a genuine issue whether Cianbro was also a person presumed to have authority to procure necessaries by dint of the authority delegated to Cianbro by Hornbeck under the VCC.[7] Nevertheless, even if Hornbeck Offshore Services and Cianbro are persons presumed to have authority to procure necessaries, for purposes of section 31341, it does not automatically follow that Dean Steel's act of supplying HUB with steel amounted to a provision of necessaries *to the vessels on the order of* either Hornbeck Offshore Services or Cianbro, for purposes of section 31342.

---

[7] As Dean Steel argues, this conclusion is reinforced by the language of the VCC, which reflects that Hornbeck understood that liens may arise against the vessels on account of actions undertaken by Cianbro, meaning that Hornbeck regarded Cianbro as it agent for the procurement of necessaries for the VCC project. (Def.'s Opposition Mem. at 8, 11.)

11

Dean Steel argues that liens arose in this case because it supplied materials and performed services ultimately incorporated into the VCC project, the project was undertaken at the order of the Hornbeck Offshore Services, and the supplies and services were procured in accordance with Cianbro's authority under the VCC. (Def.'s Opposition Mem. at 3, 5-6.) In support of such a finding Dean Steel observes that the selection of HUB to complete a portion of the VCC project was a selection made by Hornbeck. (Id. at 7, 9.) Dean Steel emphasizes also that Cianbro issued a purchase order for structural steel components to HUB understanding that HUB would have to obtain the structural steel from another supplier before it could construct the structural steel components. (Id. at 9.) Finally, Dean Steel repeatedly insists that the absence of any purchase order or contract running directly from Hornbeck or Cianbro to Dean Steel is irrelevant to the question of whether a maritime lien arose in this case. (Id. *passim*, citing Tramp Oil & Marine, Ltd. v. M/V Mermaid I, 805 F.2d 42 (1st Cir. 1986).)

I conclude, ultimately, that the material issue is not whether the steel made its way into the vessels, or whether Hornbeck selected HUB, or whether Cianbro understood that HUB would seek out a steel supplier for the raw materials it needed in order to fulfill Cianbro's purchase order for structural steel components. Rather, the issues are (1) whether the record is able to support a finding that the person who placed the order Dean Steel filled, *i.e.*, HUB, did so on the authority of the either Hornbeck or Cianbro to bind the vessels, see Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV, 199 F.3d 220, 225-26 (5th Cir. 1999) (assessing the authority of the person making the selection of the party who performed stevedoring services), and (2) whether Dean Steel's fulfillment of HUB's order amounted to a delivery of necessaries to the vessel by Dean Steel, Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 6-8 (1920) (rejecting liens for coal used by vessels because the coal was not delivered to

12

the vessels by the claimant). I conclude that Dean Steel fails to generate a genuine issue of material fact on these material issues.

**A.     HUB had no authority, actual or apparent, to bind the vessels.**

HUB was not a person presumed to have authority to procure necessaries for the vessels under section 31341. HUB was not the owner, the master, a person entrusted with the management of the vessels at the port of supply, or an officer or agent appointed by the owner. 46 U.S.C. § 31341. Dean Steel argues that it reasonably believed that HUB was an agent of Hornbeck or Cianbro because Hornbeck and Cianbro both approved of HUB's bid for the structural component work, because of the purchase orders from HUB, because it received copies of the VCC specifications to enable it to perform cutting work, and because of the communications involving Cianbro that were related to the transfer of steel from Cianbro into Dean Steel's possession. (Def.'s Opposition Mem. at 12, 18; Leroux Aff. ¶ 14.) These four contentions, whether viewed individually or collectively, do not support a finding that Dean Steel's professed belief was reasonably founded from an objective standpoint. First, the simple fact that HUB was selected by persons with authority to bind the vessels cannot support a finding that any authority to bind the vessels was delegated to HUB. That proposition is clearly a non sequitur. Second, Dean Steel's reference to purchase orders it received from HUB is somewhat perplexing. The appendix Dean Steel offers does not have any copies of the purchase orders between HUB and Dean Steel. Rather, appendix exhibit B is a collection of Cianbro purchase orders directed to HUB. Third, the fact that Dean Steel received copies of the VCC specifications to enable it to perform cutting work is yet another fact that does not tend to support a finding that HUB had been delegated authority to bind the vessels. The forwarding of

13

cutting specifications[8] does not relate the existence of an agency relationship between HUB and either Hornbeck or Cianbro. Fourth, and finally, Cianbro's transfer of steel to Dean Steel falls into the same category. It did not occur on account of any contractual relationship between Dean Steel and Cianbro. Nor does it communicate that there had been any kind of delegation of authority to HUB to bind the vessels.

Dean Steel has not been able to demonstrate that anything in the bids or any request for bids, or anything in the purchase order Cianbro sent to HUB, expressly or impliedly authorized HUB to independently procure necessaries for the vessels from third parties in agency to Hornbeck. Lake Charles Stevedores, 199 F.3d at 226-27. At most, Dean Steel was informed by HUB that the steel would be incorporated into a project involving vessels. But that basic communication is silent with respect to any authority existing in HUB to bind the vessels in relation to its own purchase of supplies. Moreover, as Cianbro argues, alleged agents cannot confer authority upon themselves. (Mot. for Summary J. at 9.) "Apparent authority is created by *conduct of the principal* which, reasonably interpreted, causes a third person to believe that the principal consents to the acts done on his behalf by the person purporting to act for him." Hampton Berm. Ltd. v. M/V Star Siranger, Civ. No. H-05-3074, 2008 U.S. Dist. Lexis 32548, *14, 2008 WL 1808550, *5 (S. D. Tex. Apr. 18, 2008) (emphasis added) (citing Cactus Pipe & Supply Co. v. M/V Montmartre, 756 F.2d 1103, 1111 (5th Cir. 1985)). This case lacks any record evidence capable of supporting a finding that either Hornbeck or Cianbro did anything to suggest to Dean Steel that HUB had been appointed authority to bind the vessels in connection

---

[8] The passive voice is in the original statement. It is not clearly stated whether HUB or Cianbro supplied the specifications.

14

with HUB's acquisition of steel. Consequently, I conclude that Dean Steel fails to generate a genuine issue of material fact whether HUB was an agent having authority to bind the vessels.

**B.      The undisputed facts fall into a "general contractor" line of precedent that prevents subcontractor suppliers in Dean Steel's position from asserting maritime liens.**

There are two lines of cases that generally divide the field when it comes to liens asserted by suppliers who have supplied necessaries based on the request of someone other than a person having authority to bind a vessel: the "general contractor/subcontractor line" and the "middle-man" or "agent/broker" line.   Lake Charles Stevedores, 199 F.3d at 228-29.  Under the general contractor/subcontractor line, a general contractor who supplies necessaries on order from a person with authority to bind the vessel has a maritime lien. Id. at 229.  "However, subcontractors hired by those general contractors are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." Id. See also, e.g., Port of Portland v. The M/V Paralla, 892 F.2d 825, 828 (9th Cir. 1989) ("It is the general rule that a general contractor does not have the authority to bind a vessel.").  There are cases in this line that resist the rule, but they involve situations in which the contractor hired the subcontractor directly to perform specific services necessary to its own performance of the general contract. Riedel Envtl. Servs., Inc. v. M/V Tula, 1987 AMC 2378 (S.D. Ala. 1987).  Here, I have assumed that Cianbro did have authority to bind the vessel by virtue of its authority under the VCC, but nevertheless, application of the general contractor line puts Dean Steel in the unfavorable position of being a subcontractor supplier to another subcontractor supplier,[9] not in the position of being a

---

[9]     My use of the term "subcontractor supplier" is in keeping with other courts. See, e.g., Farwest Steel Corp. v. Barge Sea-Span 241, 828 F.2d 522, 526 (9th Cir. 1987) (describing the general contractor line of cases as cases in which "subcontractor suppliers have sought federal maritime liens"); Thorn's Diesel Serv. v. Houston Ship Repair,

15

subcontractor or supplier to the owner's agent with respect to the vessel.  Ultimately, the circumstances offer no reasonable justification to infer that the subcontractor (HUB) had authority to bind the vessels with respect to its acquisition of its construction supplies.  This finding is reinforced by the facts that (1) Dean Steel has no contractual ties to the general contractor (Cianbro), (2) there is no evidence that its selection as a supplier by HUB was required or even reviewed by Hornbeck or Cianbro, and (3) its performance was not subject to the contractor's or the owner's oversight or approval.  Compare Thorn's Diesel Serv. v. Houston Ship Repair, Inc., 233 F. Supp. 2d 1332, 1352 (M.D. Ala. 2002) (involving subcontractor's direct vessel conversion work on vessel, subject to direct oversight and inspection by the owner's agent).

The second line of cases is known as the "middle-man" or "agent/broker" line.  In this line of cases there have been "as many as five layers between the owner of the vessel and the service provider, yet the service provider was still permitted a lien against the vessel."  Crescent City Marine, Inc. v. M/V Nunki, 20 F.3d 665, 667 (5th Cir. 1994).  Dean Steel argues that the First Circuit "adheres" to this line of cases to the exclusion of the general contractor line.  (Def.'s Opposition Mem. at 12.)  This is a misleading argument.  The point is that there are two lines of precedent for two different kinds of cases.  The fact that the First Circuit may have addressed an agent/broker scenario before does not mean that it would not treat a general contractor case in the manner that other courts have treated them.

The case chiefly relied upon by Dean Steel is Tramp Oil & Marine, LTS v. M/V Mermaid I, 805 F.2d 42 (1st Cir. 1986).  Tramp Oil bears very little resemblance to this case.

---

Inc., 233 F. Supp. 2d 1332, 1349 (M.D. Ala. 2002) (same).  The point is only that Dean Steel cannot avoid being treated as a subcontractor just by referring to itself as a "supplier."

Among other things, the determination of Tramp Oil turned on "the rule of advances," an admiralty law rule that has no bearing here. Id. at 45. In Tramp Oil, the master of a vessel requested a delivery of bunker fuel to the vessel from party A. Party A then requested that party B make the necessary arrangements. Party B contacted Tramp Oil, a broker of bunker fuel. Tramp Oil then entered into an agreement with party C, who caused party D to supply the fuel to the vessel. Id. at 44. Tramp Oil then paid party C and party C paid party D. Tramp Oil invoiced party B and party A. Party A paid party B based on the invoice. Party B then paid Tramp Oil roughly half of what it was due. Id. Tramp Oil maintained that it had a lien on the vessel based not on the delivery of bunker fuel, but based on its advance of payment to parties C and D. The First Circuit agreed with the District Court that Tramp Oil had no lien. That conclusion turned on the fact that the record did not contain evidence that the owner or master authorized payment to parties C or D on behalf of the vessel. Id. at 45. The case does not really afford any guidance to the Court with respect to the present dispute.

     Another decision in this line that Dean Steel relies on is Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky, 869 F.2d 473 (9th Cir. 1988). Marine Fuel is like Tramp Oil in that a person with authority to bind the vessel placed an order for bunkers fuel with a broker and a party two steps further on actually delivered the fuel. However, the party seeking the lien in Marine Fuel was the party two steps further down that actually delivered the bunkers fuel to the vessel. Additionally, the bunkers fuel was not only ordered by persons having authority to bind the vessel, but its delivery was also facilitated and accepted by other persons having authority to bind the vessel. The lien was recognized by the Ninth Circuit, but the Marine Fuel scenario simply is not the scenario presented here. Among other distinctions, Dean Steel did not deliver any steel to the vessels. Nor was Dean Steel a middle-man who received an order from a person

17

having authority to bind the vessels. Indeed, Dean Steel never really explains what role it filled in the typical middle-man/broker scenario.

As in Lake Charles Stevedores, I "view the facts of the instant case as more akin to those in which general contractors have been engaged to supply a service and have called upon other firms to assist them in meeting their contractual obligations." 199 F.3d at 230. Under the general contractor line, Dean Steel has no lien, because it made delivery on the order of a subcontractor having no authority to bind the vessel.

### C.  There is no delivery to the vessels by Dean Steel.

This case is also marked by another significant feature: Dean Steel did not actually furnish steel to the vessels. Rather, Dean Steel furnished the steel to a third party who separately used the steel to manufacture components for the ship. Dean Steel never even attended the vessels at any point during Cianbro's performance of the VCC project. Thus, even though the steel made its way into the vessels, the steel did not arrive pursuant to a general contract calling upon Dean Steel to supply the vessels with steel. Nor did the steel arrive at the vessels pursuant to a subcontract between HUB and Dean Steel to deliver steel to the vessels. It did so pursuant to an agreement between HUB and Dean Steel for Dean Steel to supply HUB with steel. HUB's acquisition or acceptance of steel from Dean Steel for assembly of structural components did not amount to delivery of necessities to the vessels by Dean Steel. It was an independent arrangement made between HUB and Dean Steel to supply HUB with raw materials for HUB's purposes.

In Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., the Supreme Court held that a coal dealer did not have maritime liens against vessels that used the coal because the coal dealer delivered the coal to the owner's factories rather than to the vessels. 254 U.S. 1, 6-8

18

(1920).  When the coal ultimately reached the vessels, it did so at the direction of the corporate owner of the fleet of vessels, not at the direction of the coal dealer.  Id. at 7.  The Court explained that "the fact that such a use [for the vessels] had been contemplated does not render the subsequent appropriation by the owner a furnishing by the coal dealer to the several vessels."  Id. at 8.  It also held that "[t]he fact . . . that the parties understood the law would afford a lien on the vessels for the coal is, in this controversy, without legal significance," because the coal was not actually furnished to the vessels by the coal dealer.  Id. at 10.  "The difficulty" was that the coal dealer "did not furnish coal to the vessels . . . and there is nothing in the Act . . . which removes that obstacle."  Id. at 11.  See also id. at 13 ("The difficulty . . . is . . . in failure to prove that [the coal] was furnished *by* the libellant.")

In the present case, once again the simple fact is that Dean Steel furnished steel to HUB rather than to the vessels.  Subsequently, HUB furnished structural steel components to the vessels, but this furnishing of necessaries to the vessel was not performed by Dean Steel.  I conclude in this circumstance that Dean Steel's delivery of steel to HUB cannot be considered to be a furnishing of necessaries to the vessels by Dean Steel and that, consequently, no liens have arisen on the vessels.  In fact, this case would appear to be even clearer than the situation in Piedmont because the delivery was not even to the owner of the vessel or some other person with authority to bind the vessel, whereas in Piedmont the delivery did at least go directly to the owner.  Dean Steel fails to generate a genuine issue of material fact whether it made delivery of its steel to the vessels.

**D.    Dean Steel concedes the plaintiffs' claims concerning the Old Bow Sections.**

The plaintiffs' complaints also request a declaration that the Old Bow Sections removed from the Vessels are not subject to any maritime lien or notice of claim of maritime lien in favor

19

of Dean Steel. The plaintiffs both advance this claim in their motions for summary judgment. Dean Steel has offered no opposition to this request. It does not even mention the Old Bow Sections in its consolidated opposition memorandum. I recommend that the Court treat the second counts as conceded by Dean Steel.

## CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court GRANT Plaintiff Cianbro Corporation's Motion for Summary Judgment (Doc. 36) and Intervenor Plaintiffs Hornbeck Offshore Services' and Hornbeck Offshore Transportation's Motion for Summary Judgment (Doc. 44) on all claims. I recommend the Court enter a declaratory judgment on behalf of the plaintiffs declaring that the vessels BENNO C. SCHMIDT and ENERGY SERVICE 9001 are not subject to any maritime lien or Notice of Claim of Maritime Lien in favor of Dean Steel. The judgment should further declare that the Old Bow Sections removed from the above-referenced vessels are likewise not subject to any maritime lien or Notice of Claim of Maritime Lien in favor of Dean Steel.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

February 25, 2009

20